## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Sep 11 2018, 8:00 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Danielle Sheff
Sheff Law Office
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Termination of the Parent-Child Relationship of: Ka.C., R.W., A.W. and L.C., Minor Children, | September 11, 2018 |
| K.C., Mother, | Court of Appeals Case No. 18A-JT-646 |
| *Appellant-Respondent*, | Appeal from the Marion Superior Court |
| v. | The Honorable Gary Chavers, Judge Pro Tem |
| The Indiana Department of Child Services, | The Honorable Larry Bradley, Magistrate |
| *Appellee-Petitioner*, | Trial Court Cause Nos. 49D09-1706-JT-520 49D09-1706-JT-521 49D09-1706-JT-522 49D09-1706-JT-523 |
| and | |
| Child Advocates, Inc., | |

*Guardian Ad Litem.*

**Brown, Judge.**

[1]    K.C. ("Mother") appeals the involuntary termination of her parental rights with respect to Ka.C., R.W., A.W., and L.C. (the "Children"). We affirm.

### Facts and Procedural History

[2]    Ka.C. was born in October 2003, R.W. was born in December 2007, A.W. was born in August 2009, and L.C. was born in May 2011. On June 12, 2017, the Indiana Department of Child Services ("DCS") filed a petition for termination of Mother's parental rights as to the Children. On January 31, 2018, the court held an evidentiary hearing.

[3]    On February 27, 2018, the court entered an order terminating Mother's parental rights as to the Children which provided in part:

> 2. [Ka.C.'s] father is unknown.
>
> 3. The father of [R.W.], [A.W.], and [L.C.] has had his parental rights involuntarily terminated.
>
> * * * * *
>
> 6. In August of 2015, the children were detained and placed in kinship care where they remain.
>
> 7. On October 30, 2015, the children were found to be in need of services after [Mother] filed an admission that [Ka.C.] had made

allegations of sexual abuse by extended family members and the family needed services to address those allegations.

* * * * *

12. Home based case management was referred multiple times to address issues of housing, employment, transportation, and to access community resources. [Mother] failed to successfully complete case management due to her inconsistent participation.

13. Housing has not been adequately addressed as [Mother] and her husband have been residing in a hotel for the past two to three months. They had lived with [Mother's] mother prior to the hotel.

14. [Mother] has failed to obtain independent, appropriate housing in the two and one half years the children's CHINS case has been pending.

15. Transportation has been an issue for [Mother] who failed to obtain her driver's permit.

l6. [Mother] has reported being employed at Walmart.

17. [Mother] does not feel she needs further case management services because she has employment.

18. Home based therapy has been in place consistently for a little over one year to address neglect and keeping her children safe, anger, and education toward the children's mental health needs.

19. Jessica Gordon is the current therapist.

20. [Mother] has made a big improvement in her mood and anger management.

21. After a year in therapy, [Mother] still does not totally grasp the mental health needs of her children, although Therapist Gordon believes with continued consistent participation, [Mother] could meet this goal.

22. The main barrier in keeping her children safe is [Mother's] underlying lack of accepting that [Ka.C.] was molested and the extent of it. She continues to minimize her role in the involvement with the IDCS, and fails to take responsibility.

23. At trial in this matter, [Mother] acknowledged that she did not believe [Ka.C.'s] cousin abused her.

24. On the day of trial [Mother] told her therapist she wanted the whole family to take a lie detector test.

25. At an early provider meeting in August of 2015, [Mother] did describe seeing molestation but not pursuing it because she thought her family would be "put out on the street".

26. [Mother's] therapist believes [Mother] needs to continue in therapy and that she is capable of improving.

27. [Mother] has recently started meeting with her therapist two times a month instead of weekly because of her work schedule.

28. [Mother] did not attend three child and family team meetings held in December of 2017, and January of 2018.

29. Due to [Mother's] aggressive and negative behavior, her parenting was stopped by the IDCS in 2015, and the Court ordered the suspension of parenting time on January 27, 2016, when the Guardian ad Litem reported to the CHINS Court that the children expressed concerns during their parenting time, and although they miss their mother, they were being traumatized by having contact with her.

30. On May 24, 2017, the CHINS Court changed the children's permanency plan to adoption and finding, in part, that [Mother] had failed to address untreated mental health needs, she had not reached a point in treatment to where providers recommended parenting time resume, and that further delay in achieving permanency for the children was likely to cause additional emotional distress.

31. The children have resided together in the same kinship care placement since their removal.

32. This placement is pre-adoptive.

33. The children are very bonded with one another, and have a close relationship to their caregivers.

34. [Ka.C.] had believed her caregiver . . . was her father and she looks to him as her father.

35. All four children have been involved in therapy with Deidre Lloyd [sic] for approximately fourteen months.

36. [Ka.C.] is involved in individual therapy and with her sisters due to trauma from physical and sexual abuse. A specialist in sexually maladaptive behavior has also been referred.

37. [L.C.] and [R.W.] receive therapy for separation trauma.

38. [A.W.] has a learning disability and receives therapy for anxiety and depression.

39. The children's special needs are being met by their caregivers who are aware of what the girls need and provide consistency.

40. The children have always been together, and their Therapist Lloyd [sic] would be concerned if they were separated.

41. The children have stated to the therapist their desire to remain where they are.

42. After Therapist Lloyd [sic] recently spoke with [Mother's] therapist, Ms. Gordon, she did not have the impression that [Mother] was getting better.

43. There is a reasonable probability that the conditions that resulted in the children's removal and continued placement outside the home will not be remedied by their mother. [Mother] may have made progress in therapy but it [is] unknown whether

she can apply skills in real life. After two and one-half years, she has not reached the stage of having visits recommended. Most concerning is [Mother's] lack of acceptance for the reason (and lack of accepting responsibility) why the children became wards. [Mother] has not been able to provide a home appropriate for her children during the pendency of the CHINS matter.

44. There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the children's well-being in that it would pose as a barrier to obtaining permanency for them through an adoption into the home in which they wish to remain. Without addressing unstable or inappropriate housing, and not accepting the molestation, and truly understanding its impact, [Mother] would not be able to maintain the children in a safe and stable environment.

45. Jill English-Cheatham has served as the children's Guardian ad Litem since the beginning of the CHINS action in July of 2015. Based on lack of safety, and the children's wishes, Ms. English-Cheatham recommends adoption as a satisfactory plan for the children and believes termination of [Mother's] parental rights would be in the children's best interests.

46. Guardian ad Litem English-Cheatham does not believe [Mother] should be given more time as she has had multiple providers and the children have been in limbo for two and one-half years. She believes the children would be harmed if removed from their placement.

47. Termination of the parent-child relationship is in the best interests of the children. Termination would allow them to be adopted into a stable and permanent home where their needs will be safely met.

48. There exists a satisfactory plan for the future care and treatment of the children, that being adoption.

Appellant's Appendix Volume II at 34-37.

## *Discussion*

The issue is whether the evidence is sufficient to support the termination of Mother's parental rights. In order to terminate a parent-child relationship, DCS is required to allege and prove, among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). If the court finds that the allegations in a petition described in Ind. Code § 31-35-2-4 are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

The State's burden of proof for establishing the allegations in termination cases "is one of 'clear and convincing evidence.'" *In re G.Y.*, 904 N.E.2d 1257, 1260-1261 (Ind. 2009) (quoting Ind. Code § 31-37-14-2), *reh'g denied*. This is "a 'heightened burden of proof' reflecting termination's 'serious social

consequences.'" *In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014) (quoting *In re G.Y.*, 904 N.E.2d at 1260-1261, 1260 n.1). "But weighing the evidence under that heightened standard is the trial court's prerogative—in contrast to our well-settled, highly deferential standard of review." *Id.* We do not reweigh the evidence or determine the credibility of witnesses, but consider only the evidence that supports the judgment and the reasonable inferences to be drawn from the evidence. *Id.* We confine our review to two steps: whether the evidence clearly and convincingly supports the findings, and then whether the findings clearly and convincingly support the judgment. *Id.*

[6]     Reviewing whether the evidence clearly and convincingly supports the findings, or the findings clearly and convincingly support the judgment, is not a license to reweigh the evidence. *Id.* "[W]e do not independently determine whether that heightened standard is met, as we would under the 'constitutional harmless error standard,' which requires the reviewing court itself to 'be sufficiently confident to declare the error harmless beyond a reasonable doubt.'" *Id.* (quoting *Harden v. State*, 576 N.E.2d 590, 593 (Ind. 1991) (citing *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824 (1967))). "Our review must 'give "due regard" to the trial court's opportunity to judge the credibility of the witnesses firsthand,' and 'not set aside [its] findings or judgment unless clearly erroneous.'" *Id.* (quoting *K.T.K. v. Ind. Dep't of Child Servs., Dearborn Cty. Office*, 989 N.E.2d 1225, 1229 (Ind. 2013) (citing Ind. Trial Rule 52(A))). "Because a case that seems close on a 'dry record' may have been much more clear-cut in person, we must be careful not to substitute our judgment for the trial court

when reviewing the sufficiency of the evidence." *Id*. at 640. The involuntary termination statute is written in the disjunctive and requires proof of only one of the circumstances listed in Ind. Code § 31-35-2-4(b)(2)(B).

[7] Mother contends the trial court's order is not supported by clear and convincing evidence, her failure to protect the Children from abuse was being addressed, and, although she had not resolved her housing, the time needed to obtain suitable housing should not be the determining factor. She also asserts termination is not in the Children's best interests and the plan of adoption by P. and M. would be detrimental to the Children.

[8] DCS maintains that Mother failed to fully engage in reunification services, denied home-based case management was necessary despite not having stable housing, demonstrated she is unable to provide the Children with a safe environment, and was aware Ka.C. was being sexually molested but failed to protect her. DCS also argues that termination is in the Children's best interests and that it has a satisfactory plan for their care and treatment.

[9] In determining whether the conditions that resulted in the Children's removal will not be remedied, we engage in a two-step analysis. *See E.M.*, 4 N.E.3d at 642-643. First, we identify the conditions that led to removal, and second, we determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* at 643. In the second step, the trial court must judge a parent's fitness as of the time of the termination proceeding, taking into consideration evidence of changed conditions, balancing a parent's recent

improvements against habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id.* We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination. *Id.* Requiring trial courts to give due regard to changed conditions does not preclude them from finding that a parent's past behavior is the best predictor of her future behavior. *Id.*

[10] The statute does not simply focus on the initial basis for a child's removal for purposes of determining whether a parent's rights should be terminated, but also those bases resulting in the continued placement outside the home. *In re N.Q.*, 996 N.E.2d 385, 392 (Ind. Ct. App. 2013). A court may consider evidence of a parent's prior criminal history, history of neglect, failure to provide support, lack of adequate housing and employment, and the services offered by the DCS and the parent's response to those services. *Id.* Where there are only temporary improvements and the pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances the problematic situation will not improve. *Id.*

[11] To the extent Mother does not challenge the trial court's findings of fact, the unchallenged facts stand as proven. *See In re B.R.*, 875 N.E.2d 369, 373 (Ind. Ct. App. 2007) (failure to challenge findings by the trial court resulted in waiver of the argument that the findings were clearly erroneous), *trans. denied.*

[12] The court found that Ka.C. had made allegations of sexual abuse by extended family members, home-based case management was referred multiple times to address housing, employment, and transportation, and Mother failed to successfully complete case management due to her inconsistent participation. With respect to housing, the court found that Mother failed to obtain independent, appropriate housing during the two and one-half years the CHINS cases were pending and that she and her husband were residing in a hotel for the prior two to three months. The court also found that transportation has been an issue for Mother and she failed to obtain her driver's permit. It found that home-based therapy to address neglect had been in place for over a year and that Therapist Gordon believed Mother made improvement in her mood and anger management, but that Mother still does not totally grasp the mental health needs of the Children although she could meet the goal with continued consistent participation. It also found that the primary barrier in keeping the Children safe is Mother's failure to accept the extent to which Ka.C. was molested, that Mother continues to fail to take responsibility, that she acknowledged she did not believe Ka.C.'s cousin abused her, that Mother told her therapist she wanted the whole family to take a lie detector test, and that she described seeing molestation but not pursuing it because she thought her family would be on the street. Therapist Gordon testified that Mother lived in a motel with her husband and did not have a vehicle. Jill English-Cheatham, the Children's Guardian ad Litem, ("GAL English-Cheatham") testified that at one point Mother discussed sexual abuse she witnessed Ka.C. endure with Mother's brother and that Mother "described that the family was living with her mother

at the time and that she did not pursue it because her mother threatened that if she did that she would put the family out on the streets." Transcript Volume II at 116.

[13] Based upon the court's findings and the record, we conclude that clear and convincing evidence supports the trial court's determination that there is a reasonable probability that the conditions leading to the Children's removal will not be remedied or that the continuation of the parent-child relationship poses a threat to the well-being of the Children.

[14] In determining what is in the best interests of a child, the trial court is required to look beyond the factors identified by DCS and to the totality of the evidence. *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). In so doing, the court must subordinate the interests of the parent to those of the children. *Id.* Children have a paramount need for permanency which the Indiana Supreme Court has called a central consideration in determining the child's best interests, and the Court has stated that children cannot wait indefinitely for their parents to work toward preservation or reunification and courts need not wait until the child is irreversibly harmed such that the child's physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *In re E.M.*, 4 N.E.3d at 647-648. However, focusing on permanency, standing alone, would impermissibly invert the best-interests inquiry. *Id.* at 648. The testimony of a child's guardian ad litem regarding the child's need for permanency supports a finding that termination is in the child's best interests. *McBride*, 798 N.E.2d at

203. Recommendations by both the case manager and child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1158-1159 (Ind. Ct. App. 2013).

[15] The record reveals that Jonquil Pettigrew, a family case manager, ("FCM Pettigrew") testified that termination of Mother's parental rights is in the Children's best interests. Also, GAL English-Cheatham testified that it was in the Children's best interests that Mother's parental rights be terminated, she did not believe Mother should be given additional time to complete services, and "[w]e've been working at this for two and a half years with little to no progress" and the Children "need to be able to process with a direction." Transcript Volume II at 128. Based on the testimony, as well as the totality of the evidence in the record and set forth in the court's termination order, we conclude that the court's determination that termination is in the best interests of the Children is supported by clear and convincing evidence.

[16] In addition, adoption is a "satisfactory plan" for the care and treatment of a child under the termination of parental rights statute. *In re B.M.*, 913 N.E.2d 1283, 1287 (Ind. Ct. App. 2009). "This plan need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated." *In re Termination of Parent-Child Relationship of D.D.*, 804 N.E.2d 258, 268 (Ind. Ct. App. 2004), *trans. denied*. FCM Pettigrew and GAL English-Cheatham testified that adoption is a

satisfactory plan for the Children's care and treatment. To the extent Mother argues that P. and M. are not suitable potential adoptive parents, we observe that we have found that a plan for a child to be adopted by current foster parents or another family may constitute a suitable plan for the child's future care. *See id*. The termination order here does not require that adoption by P. and M. be pursued, and any petition for adoption will be adjudicated in a subsequent proceeding. *See* Ind. Code §§ 31-19. Deidra Loyd, the Children's therapist, testified that the Children "have shared with me and expressed with me in session stating that they desire to stay where they are." Transcript Volume II at 84. The record reveals support for the court's determination that adoption is a satisfactory plan for the care and treatment of the Children.

### *Conclusion*

[17] We conclude that the trial court's judgment terminating the parental rights of Mother is supported by clear and convincing evidence. We find no error and affirm.

[18] Affirmed.

Altice, J., and Tavitas, J., concur.